UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
JAMES FITZGERALD,                       )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )        Civil Action No. 22-11840-JCB
                                        )
CITY OF LAWRENCE and LAWRENCE           )
FIRE CHIEF BRIAN MORIARTY,              )
                                        )
            Defendants.                 )
_____)

<u>ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>
[Docket Nos. 48, 66]

November 21, 2024

Boal, M.J.

In this action, plaintiff James Fitzgerald alleges that he was terminated by the City of

Lawrence on the basis of a disability and brings claims under the Americans with Disabilities

Act ("ADA") and Massachusetts law.  Defendants the City of Lawrence and Lawrence Fire

Chief Brian Moriarty have moved for summary judgment.  Docket No. 48.[1]  For the following

reasons, I grant the Defendants' motion.

I.      <u>FACTUAL BACKGROUND</u>

        A.      <u>Scope Of The Record</u>

        As a preliminary matter, I must determine the proper scope of the record.  Defendants

have filed a motion to strike Fitzgerald's declaration (Docket No. 58-12) ("Fitzgerald Decl."),

certain exhibits, and portions of his statement of additional facts.  Docket No. 66.

---

[1] On January 10, 2023, the parties consented to the jurisdiction of a U.S. Magistrate Judge for all
purposes.  Docket No. 12.

_Documents Not Produced In Discovery_.  Defendants argue that this Court should strike Fitzgerald's Exhibits 1 and 2, which consist of two sets of telephone records, because they were never produced in discovery.  Docket No. 67 at 2.[2]  They also request that this Court strike any related statements that relied on these exhibits, including paragraphs 64, 71, and 77 of Fitzgerald's statement of facts, and paragraphs 4-5 and 7 of his declaration.  Id. at 3.  According to Defendants, those records were responsive to their requests for production numbered 4, 5, and 15, which requested:

> **REQUEST NO. 4**: Any and all non-privileged documents that might support the allegations contained in the Third Amended Complaint.
>
> **REQUEST NO. 5**: Any and all non-privileged documents that relate in any way to the allegations contained in the Third Amended Complaint.
>
> **REQUEST NO. 15**: Any and all non-privileged communications – including emails, text messages, notes, letters, and/or recordings, and any other communication of any kind – between you and any other individual or entity relating to the allegations contained in the Third Amended Complaint.

Id. at 2.  These requests, seeking documents that "might" support or "relate in any way" to all of the allegations in Fitzgerald's complaint, however, are vague and overly broad.  Fitzgerald properly objected to those requests and did not indicate that he would produce responsive documents.  See Docket No. 73-1 at 2, 4.  The Defendants never moved to compel Fitzgerald to produce documents responsive to these requests.  Accordingly, I deny the request to strike Fitzgerald's Exhibits 1 and 2 and any statements of fact or paragraphs in Fitzgerald's declaration that relied on these exhibits.

---

[2] Citations to "Docket No. ___" are to documents appearing on the Court's electronic docket. They reference the docket number assigned by CM/ECF, and include pincites to the page numbers appearing in the top right corner of each page within the header appended by CM/ECF.

*Sham Affidavit Rule*.  The Defendants also argue that paragraphs 2, 3, and 7 of Fitzgerald's declaration, as well as statements of fact relying on these paragraphs (SOF ¶¶ 59-65, 71, 77-78), should be stricken because they contradict his prior deposition testimony.  Docket No. 67 at 3-4.  Under the sham affidavit rule, "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."  Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 20 (1st Cir. 2000) (quoting Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994)). However, "[a] subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment."  Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 26 (1st Cir. 2002).

At his deposition, Fitzgerald testified about the limitations resulting from his dog bite injury.  He stated that he had difficulty touching his fingers to his thumb, getting dressed and tying his shoes, carrying groceries, starting his car with a key, putting his son's crib together, going to the bathroom, showering, and "just basically like everything that you don't realize how much you use your arms, but those are the main things that I can recall."  Docket No. 58-14 at 120-122.  When counsel asked "was there anything else you couldn't do as a result of the dog bite?", Fitzgerald replied "no."  Id. at 122.  In paragraphs 2 and 3 of his declaration submitted in opposition to Defendants' motion for summary judgment, he now states that the dog bite injury also limited his ability to "grasp" things, cook, or do laundry.  Docket No. 58-12 at 1-2.  I find that these statements do not contradict but rather amplify Fitzgerald's prior testimony.

At his deposition, Fitzgerald also testified that he could recall one phone call with Chief Moriarty shortly after being in the hospital, during which they discussed his dog bite injury, poor

performance at the Massachusetts Fire Academy, and use of sick time.  See Docket No. 58-14 at 129-134.  He also testified that he could not recall a second phone call with Chief Moriarty.  Id. at 135.  In paragraph 7 of his affidavit, Fitzgerald now states that the phone records show that he attempted to call Moriarty twice on or about October 23 without success and was able to reach him on October 24, at which time Moriarty told him that he was not sure what would happen to him because this was the second time that Fitzgerald had taken sick leave.  Docket No. 58-12 at 3.  Defendants argue that paragraph 7 is contradictory of Fitzgerald's deposition testimony and should be stricken.  Docket No. 67 at 4.

Fitzgerald's recollection of a second phone call with Chief Moriarty after reviewing phone records is not directly contradictory of his prior testimony that he could not remember a second phone call at the time of his deposition.  While his ability to recall the substance of that conversation now could be the subject of cross-examination at a trial, I find that paragraph 7 of the declaration is properly considered in connection with Defendants' motion for summary judgment.

_Immaterial Statements_.  Defendants argue that paragraphs 6 and 8 of Fitzgerald's declaration, as well as paragraphs 47-50, 53, 62-64, 77-78, 89, 91-92, 95-96, and 101 of Fitzgerald's statement of facts and his responses to paragraphs 7, 22, 41, and 45 to the Defendants' statement of facts, should be stricken because they contain immaterial information.  Docket No. 67 at 5-7.  Arguments regarding the materiality of statements of fact should be made in connection with a discussion of the merits.  This Court therefore declines to strike such statements and will discuss their materiality as appropriate in its discussion of the merits of Fitzgerald's claims.  Where this Court cites to one of these statements in this opinion, it is because it has found such fact to be relevant and material to the discussion.

*Unemployment Proceedings*.  Defendants argue that paragraph 9 of Fitzgerald's affidavit, Exhibit 10, and paragraph 102 of the statement of facts should be stricken because they relate to proceedings before the Massachusetts Department of Unemployment Assistance, which are confidential and protected by privilege under Massachusetts law.  Docket No. 67 (citing M.G.L. c. 151A, § 46).  This Court disagrees with the Defendants' reading of M.G.L. c. 151A, § 46 but, in any event, finds that this information is not material to its analysis and has therefore not considered it.

*Subjective Conclusions And Speculative Opinions*.  Defendants argue that paragraphs 72, 74, 81, 87-89, 92, 94, and 99 should be stricken because they are based entirely on "subjective conclusions and speculative opinions."  Docket No. 67 at 7.  This Court disagrees with Defendants' characterization of some of these statements.  As appropriate and necessary, this Court will address these arguments in its recitation of the facts.

*Statements Not Supported By The Materials Cited*.  Finally, Defendants argue that paragraphs 82, 86, 94, and 97 should be stricken because they are not supported by the materials cited to by Fitzgerald.  Id. at 7-8.  This Court will discuss these statements in its recitation of the facts as necessary.

B.   Facts[3]

Fitzgerald applied for a firefighter position with the City of Lawrence on September 18,

---

[3] The facts are taken from the parties' consolidated statement of facts (Docket No. 65).  This Court refers to statements of fact as "SOF" and to responses as "Resp."  Because this case is before the Court on a motion for summary judgment, this Court sets out any disputed facts in the light most favorable to Fitzgerald, the nonmoving party, and resolving all reasonable inferences in his favor.  See Clarendon Nat'l Ins. Co. v. Philadelphia Indemnity Ins. Co., 954 F.3d 397, 403-404 (1st Cir. 2020) (citations omitted).

2018.[4]  On October 25, 2018, Fitzgerald received a conditional offer of employment as a firefighter for the City, contingent upon "being found qualified by the medical screening, passing the Physical Abilities Test (PAT); and successful completion of the Massachusetts Fire Academy operated by the Massachusetts Fire Training Council (MFTC)."[5]  The collective bargaining agreement ("CBA") governing Fitzgerald's employment also explicitly stated that "[f]irefighters who are scheduled to attend the Massachusetts Fire Academy and who fail to complete the program will be subject to automatic termination of their employment."[6]  Pursuant to M.G.L. c. 31, § 61, Fitzgerald's employment was subject to a twelve-month probationary period.[7]

Fitzgerald began working as a probationary firefighter in January of 2019.[8]  He attended an eight-week in-house training with the other recruits at the Lawrence Fire Department.[9]  He was trained on basic skills, including the use of SCBA Air-Packs.[10]

In January 2019, Fitzgerald was in the hospital for an anal fissure.[11]  Captain Martin

---

[4] SOF ¶ 1; Resp. ¶ 1.

[5] SOF ¶¶ 2-3; Resp. ¶¶ 2-3.  Fitzgerald denies that the offer was contingent upon completion of the Massachusetts Fire Academy but has cited to no evidence to support this denial.

[6] SOF ¶ 4; Resp. ¶ 4.

[7] See SOF ¶ 7.  The Defendants maintain that Fitzgerald had to complete the Academy within the one-year probationary period.  See SOF ¶ 5.  However, the evidence cited does not establish that fact.

[8] SOF ¶ 6; Resp. ¶ 6.

[9] SOF ¶ 8; Resp. ¶ 8.

[10] SOF ¶ 9; Resp. ¶ 9.  SCBA means "self-contained breathing apparatus."  Docket No. 49 at 3 n.2.

[11] SOF ¶ 10; Resp. ¶ 10.

visited him while he was in the hospital.[12]  Fitzgerald did not disclose the specific diagnosis of an anal fissure to Martin due to embarrassment.[13]  Rather, he told Martin that he was having a "stomach problem" and/or "some gastrointestinal issues."[14]  Fitzgerald was released from the hospital and returned to work the next day, working an eight-hour shift.[15]

Fitzgerald was absent from work again in February of 2019.[16]  He believes that this was also related to his anal fissure but does not recall notifying anyone at the Fire Department that his absence was related to an anal fissure.[17]  Fitzgerald submitted a doctor's note dated February 26, 2019, clearing him to return to work without restriction.[18]  The note did not provide a medical diagnosis or treatment.[19]

According to Fitzgerald, his anal fissure persisted for at least five months.[20]  It caused Fitzgerald the "worst pain that [he] ever felt in [his] life."[21]  The pain caused inability to sleep, discomfort while sitting, and going to the bathroom was uncomfortable as a result of the pain.[22]

_____

[12] SOF ¶ 11; Resp. ¶ 11.

[13] Resp. ¶ 11.

[14] Resp. ¶ 11.

[15] SOF ¶ 12; Resp. ¶ 12.

[16] SOF ¶ 13; Resp. ¶ 13.

[17] Id.  Fitzgerald partly disputes this statement but the evidence cited does not contradict the statement.

[18] SOF ¶ 14; Resp. ¶ 14.

[19] Id.

[20] SOF ¶ 46.

[21] SOF ¶ 47; Resp. ¶ 47.

[22] Id.

He was prescribed nitroglycerin cream, which caused "terrible headaches."[23]

On or about May 8, 2019, Fitzgerald went to the hospital because he was unable to urinate.[24]  It was determined that the situation was life-threatening because it could have caused Fitzgerald to become septic.[25]  He was diagnosed with a "perianal abscess" and a "hypertonic internal anal sphincter" in connection with the anal fissure.[26]  On May 8, Fitzgerald underwent an "emergent exam" and received a Botox injection for the purpose of "chemical denervation of internal anal sphincter."[27]  On May 9, a "lateral internal sphincterotomy" surgery was performed.[28]  He remained in the hospital for a few nights and was unable to return to work immediately because of pain and potential incontinence.[29]  He was cleared to return to work without restrictions on May 27, 2019.[30]  The doctor's note clearing him for work did not provide a medical diagnosis or treatment.[31]

On September 19, 2019, Fitzgerald started the Massachusetts Fire Academy.[32]  After his first week at the Academy, Chief Moriarty received an evaluation report from one of the

---

[23] SOF ¶¶ 48, 49; Resp. ¶¶ 48, 49.

[24] SOF ¶ 50; Resp. ¶ 50.

[25] Id.

[26] SOF ¶ 51; Resp. ¶ 51.

[27] Id.

[28] Id.

[29] SOF ¶¶ 51-52; Resp. ¶¶ 51-52.

[30] SOF ¶ 16; Resp. ¶ 16; see also Docket No. 50-10.

[31] Id.

[32] SOF ¶ 19; Resp. ¶ 19.

Academy instructors, explaining that Fitzgerald lacked motivation during physical training and that he tended to slow down or to stop exercising when he thought his instructors were not observing him.[33]  Fitzgerald also failed an air pack drill test.[34]  During his time at the Academy, Fitzgerald received 59 deficiency points, of which 34 were for his failure of the air pack drill test.[35]

On October 13, 2019, Fitzgerald sustained injuries to his right forearm, hand, and wrist after being attacked by a dog.[36]  He was treated at Lawrence General Hospital, where he was given a tetanus shot.[37]  He was later admitted to Beth Israel Deaconess, where he was diagnosed with "forearm cellulitis 2/2 animal bite" and given IV antibiotics.[38] Fitzgerald was discharged from Beth Israel on October 15, 2019.[39]  He had a follow up appointment on October 23, 2019, at which time he was cleared to return to work without restrictions on October 28, 2029.[40]

According to Fitzgerald, the injury caused him pain and limited mobility in his thumb, index, and middle fingers in his right hand and right wrist.[41]  He experienced difficulty lifting

---

[33] SOF ¶ 20; Resp. ¶ 20.

[34] See SOF ¶¶ 21, 22; Resp. ¶¶ 21, 22.

[35] SOF ¶¶ 23-24; Resp. ¶¶ 23-24.

[36] SOF ¶ 27; Resp. ¶ 27.

[37] SOF ¶¶ 28, 29; Resp. ¶¶ 28, 29.

[38] SOF ¶¶ 30-32; Resp. ¶¶ 30-32.

[39] SOF ¶ 33; Resp. ¶ 33.

[40] SOF ¶¶ 34-35; Resp. ¶¶ 34-35.

[41] See SOF ¶¶ 57-59.

and carrying items, cooking, doing laundry, and getting dressed.[42]  He experienced these

limitations for two to three months.[43]

In the early morning of October 15, 2019, Fitzgerald's mother called both the Academy

and Captain Martin to inform them that Fitzgerald was in the hospital and would not be present

for work that day.[44]  Captain Martin learned that Fitzgerald had been bitten by a dog and was in

the hospital and called Chief Moriarty "right away" after receiving this news.[45]

On October 15, 2019, Chief Moriarty received an email from the Recruit Programs

Coordinator for the Academy, Dennis Ball, stating, in relevant part:

> Informing you that Recruit Fitzgerald was absent from roll call this date
> 10/15/19 for MFA Recruit Class 278.  This office did not receive any
> notification from the Recruit explaining his absence.  Several attempts to
> make contact with Recruit Fitzgerald were unsuccessful.  . . . Today is
> Training Day 16 for Recruit Class 278, the day is mandatory attendance due
> to Exam 3 being administered.  If you would like to re-assign the Recruit
> back into the Career Recruit program, please send me a correspondence
> stating that you are 'withdrawing without prejudice' due to a medical and
> request that he be re-enrolled at the soonest possible date.  If you chose to
> re-roll [sic], Recruit Fitzgerald would return to training on TD 16 with a
> future Recruit Class retaining his exam scores and deficiencies earned to
> date.[46]

Career Recruit Program Assistant Kyla MacKenzie emailed Moriarty on October 16, 2019,

---

[42] See SOF ¶¶ 59-61.

[43] See id.

[44] SOF ¶ 64.

[45] SOF ¶ 65; Resp. ¶ 65.

[46] Docket No. 50-20.

confirming receipt of a letter from Moriarty withdrawing Fitzgerald without prejudice.[47]  She

listed three Academy classes in which Fitzgerald could be enrolled, with the first starting on

November 18, as well as the graduation date for each class.[48]  The graduation dates listed were

January 10, 2020; February 7, 2020; and February 14, 2020.[49]

Fitzgerald and Chief Moriarty spoke by telephone on October 18, 2019.[50]  According to

Fitzgerald, Moriarty was angry during the call and told Fitzgerald that he heard he had a broken

arm and criticized him for having "washed out" of the Academy.[51]  Fitzgerald informed Moriarty

that his arm was not broken and that he would be visiting a hand surgeon.[52]  Moriarty said that

Fitzgerald had used up his sick time, told him that he would not be paid while he was at home

and that he would not be permitted to use the sick bank.[53]

Fitzgerald and Moriarty spoke again on October 24, 2019.[54]  According to Fitzgerald,

Moriarty told him that he was not sure what would happen with him because it was the second

---

[47] SOF ¶ 69; Resp. ¶ 69.  At oral argument, counsel for the Defendants explained that a
withdrawal without prejudice meant that Fitzgerald could be re-enrolled in the Academy if he
asked but he never did so.

[48] Id.

[49] Id.

[50] SOF ¶ 71.

[51] SOF ¶ 72.  Defendants object to this statement as "'mere unsupported characterizations,'
personal opinions, or 'subjective belief[s]' that do not create a triable issue."  Resp. ¶ 72.
Fitzgerald's recollection and impression of the call, however, is properly considered.

[52] SOF ¶ 73; Resp. ¶ 73.

[53] SOF ¶ 74.

[54] SOF ¶ 77.

time that Fitzgerald had taken sick leave.[55]

On October 25, 2019, Chief Moriarty sent a letter to Frank Bonet, the City of Lawrence's Personnel Director, requesting that Fitzgerald's employment be terminated.[56]  Moriarty stated, among other things, that Fitzgerald began his class in the Academy "having used much of his sick leave for the year having been out 3 different occasions during his first 8 months of training;" that he "seemed to lack motivation;" and that his failure of the air pack drill was "unacceptable."[57]  He also stated that Fitzgerald "had to be out on sick leave and use his last vacation time due to another medical issue.  He is currently out without leave or sick time being docked pay.  He has washed out of the academy due to this medical."[58]

On November 1, 2019, the City terminated Fitzgerald's employment.[59]  The termination letter stated, in relevant part:

> As you know, when you were hired as a firefighter, you were provided a condition offer of employment and subject to a 12-month probationary period pursuant to Chapter 31, Section 61 of the Massachusetts General Laws.  A number of issues have arisen during your training concerning your judgment, conduct and performance prompting the City to take this action.[60]

At a Civil Service Commission pre-hearing conference, the City asserted that Fitzgerald was

---

[55] SOF ¶ 78.

[56] SOF ¶ 42; Resp. ¶ 42.

[57] Docket No. 50-21.

[58] Id. Fitzgerald claims that he had sufficient leave to cover his absence due to the dog bite, see SOF ¶¶ 84-87, but the evidence cited does not support this assertion.

[59] SOF ¶ 44; Resp. ¶ 44.

[60] Docket No. 50-22.

terminated for a "no-call, no show."[61]

II.     ANALYSIS

A.     Standard Of Review

Summary judgment is appropriate if the record, viewed in the light most favorable to the

nonmoving party – here, Fitzgerald – "discloses 'no genuine issue of material fact' and [thus]

demonstrates that 'the moving party is entitled to a judgment as a matter of law.'"  Zabala-De

Jesus v. Sanofi-Aventis Puerto Rico, Inc., 959 F.3d 423, 427-428 (1st Cir. 2020) (quoting

Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)).  A dispute is genuine where the

evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving

party."  Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 87 (1st Cir. 2018) (citation

omitted).  A material fact is one with the "potential of changing a case's outcome."  Doe v.

Trustees of Bos. College, 892 F.3d 67, 79 (1st Cir. 2018).  "Even in employment discrimination

cases where elusive concepts such as motive or intent are at issue, summary judgment is

appropriate if the non-moving party rests merely upon conclusory allegations, improbable

inferences, and unsupported speculation.'"  Brandt v. Fitzpatrick, 957 F.3d 67, 75 (1st Cir. 2020)

(quoting Ray v. Ropes & Gray LLP, 799 F.3d 99, 116-117 (1st Cir. 2015)).

The moving party bears the initial burden of establishing that there is no genuine issue of

material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If that burden is met, the

opposing party can avoid summary judgment only by providing properly supported evidence of

disputed material facts that would require trial.  See id. at 324.  "A plaintiff opposing a properly

documented summary judgment motion must carry 'the burden of producing specific facts

sufficient to deflect the swing of the summary judgment scythe.'"  Trahan v. Wayfair Maine,

---

[61] SOF ¶ 101; Resp. ¶ 101.

LLC, 957 F.3d 54, 60 (1st Cir. 2020) (quoting Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-7 (1986) (warning that the non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence").

B.   Fitzgerald's Claims Against Moriarty Must Be Dismissed Because There
     Is No Individual Liability Under The ADA Or M.G.L. c. 151B, § 4(16)

Defendants argue that Moriarty is entitled to judgment as a matter of law on Fitzgerald's claims against him because federal and state law do not provide for individual liability under these circumstances.  Docket No. 49 at 5-7.  This Court agrees.  The ADA does not authorize individual liability actions.  Roman-Oliveras v. Puerto Rico Elec. Power Auth., 655 F.3d 43, 52 (1st Cir. 2011).  While Chapter 151B provides for individual liability in some circumstances, Fitzgerald has not shown that such circumstances apply in this case.[62]  See Melo v. City of Somerville, No. 18-10786-RGS, 2020 WL 6945938, at *3 (D. Mass. Nov. 25, 2020). Accordingly, this Court grants summary judgment in favor of Moriarty on Fitzgerald's claims against him individually.

C.   Fitzgerald Has Failed To Provide Sufficient Evidence That He Had A Legally
     Cognizable Disability Within The Meaning Of The ADA Or Chapter 151B

In order to state a claim for disability discrimination under the ADA and Massachusetts law, Fitzgerald must allege that "(1) he suffers from a disability or handicap, as defined by the ADA and Chapter 151B, that (2) he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation, and that (3) [the City] took an adverse employment action against him because of, in whole or in part, his protected disability."  Tobin

---

[62] Fitzgerald did not address this argument in his opposition and at oral argument conceded that Moriarty was not subject to individual liability.

v. Liberty Mut. Ins. Co., 433 F.3d 100, 104 (1st Cir. 2005) (citations omitted).  Defendants argue

that Fitzgerald's claims fail because he has not shown that he has a legally cognizable disability

within the meaning of the ADA or Chapter 151B.  Docket No. 49 at 7-17; Docket No. 64 at 4-12.

I agree.

      The ADA defines disability as "a physical or mental impairment that substantially limits

one or more major life activities," "a record of such an impairment," or "being regarded as

having such an impairment."  Mancini v. City of Providence by and through Lombardi, 909 F.3d

32, 39 (1st Cir. 2018).[63]  The definition of disability "shall be construed in favor of broad

coverage of individuals . . ., to the maximum extent permitted by the terms of this chapter."  Id. at

40 (quoting 42 U.S.C. § 12102(4)(A)).  Fitzgerald argues that the puncture wound and resulting

soft-tissue infection from the October 13, 2019 dog bite as well as the anal fissure he suffered in

January and February 2019 constituted both actual and "regarded as" disabilities.  Docket No. 59

at 9-17.

---

[63] Courts have generally analyzed the Massachusetts handicap discrimination statute, M.G.L. c. 151B, § 4, in the same manner as the ADA.  See Audette v. Town of Plymouth, MA, 858 F.3d 13, 20 n. 8 (1st Cir. 2017).  Before the ADA Amendments Act of 2008 ("ADAAA"), therefore, the term disability under the ADA and the term handicap under Chapter 151B had been construed in an identical manner.  See Mekonnen v. OTG Mgmt., LLC, 394 F.Supp.3d 134, 152 (D. Mass. 2019).  The ADAAA, which became effective on January 1, 2009, expanded the definition of disability.  Id.  Courts have disagreed whether the terms should continue to be construed in the same manner after the ADAAA.  Compare Murray v. Warren Pumps, LLC, No. 11-40176-DPW, 2013 WL 5202693, at *5-6 (D. Mass. Sept. 12, 2013) (employing a narrower, pre-ADAAA understanding of the term "substantially limits" under Massachusetts law) with Gil v. Vortex, LLC, 697 F.Supp.2d 234, 239 (D. Mass. 2010) ("The court is also confident that the Supreme Judicial Court ("SJC") would apply the same revised standard in interpreting the term disability for purposes of Chapter 151B.").  Out of an abundance of caution, this Court will apply the ADAAA's standard to Fitzgerald's state law claims.  See, e.g., Mekonnen, 394 F.Supp.3d at 152.

1.      Fitzgerald Has Not Provided Sufficient
        Evidence That He Had An Actual Disability

The presence of an actual disability "hinge[s] on whether the plaintiff has shown a physical or mental impairment that affects a major life activity, and if so, whether the impairment substantially limits the major life activity." Mancini, 909 F.3d at 40. A physical impairment is "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems." Id. (citing 29 C.F.R. § 1630.2(h)). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). A major life activity also includes the operation of major bodily functions. 42 U.S.C. § 12102(2)(B). Whether an impairment "substantially limits" a major life activity "calls for a comparison between the plaintiff's limitations and those of the majority of people in the general population." Mancini, 909 F.3d at 42. In addition, the "substantially limits" standard "is not intended to be a 'demanding standard' and should not engender 'extensive analysis.'" Id.

Though an impairment need not be permanent in order to constitute a disability, see Mancini, 909 F.3d at 40-41, "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities." Fuog v. CVS Pharmacy, Inc., No. 20-337 WES, 2021 WL 4355402, at *4 (D.R.I. Sept. 24, 2021) (citing to ADA's interpretive guidelines at 29 C.F.R. pt. 1630 App. § 630.2(g)).

Fitzgerald argues that the puncture wound and resulting infection arising from the October 13, 2019 dog bite constituted an actual disability because they affected several major life activities, including the bending of his wrist and fingers, lifting, dressing himself, and carrying out household tasks such as cooking and laundry. See Docket No. 59 at 10. According

to his own testimony, however, such limitations lasted, at most, three months.  See Fitzgerald

Decl. at ¶¶ 2-3.  In addition, it is undisputed that Fitzgerald was cleared to work without any

restrictions after only fifteen days.  SOF ¶ 35.[64]  Given this record, therefore, no reasonable jury

could conclude that Fitzgerald's puncture wound and resulting infection constituted an actual

disability under the ADA or Chapter 151B.  See, e.g., Francis v. Hartford Bd. of Educ., City of,

760 Fed. Appx. 34, 36 (2d Cir. 2019) (injuries limiting plaintiff's ability to lift and climb stairs

for two to five months "were too brief and too minor to qualify as disabilities under the ADA");

Gardner v. SEPTA, 410 F.Supp.3d 723, 736-737 (E.D. Penn. 2019) (work-related vehicle

accident involving several months of limitation without long-term or permanent effect not

disability under the ADA); Winnie v. Infectious Disease Assocs., P.A., No. 8:15-cv-2727-T-

35MAP, 2018 WL 10456834, at *4 (M.D. Fla. Feb. 28, 2018) (plaintiff not disabled despite

temporary restrictions following shoulder surgery, including "no work at all for two weeks

following the procedure; no use of her upper extremity from two weeks to eight weeks following

the procedure; and only light duty from eight weeks to four months following the procedure").

Fitzgerald also argues that his anal fissure was a disability because it impacted his ability

to sleep and sit without pain and these limitations continued for at least five months.  Docket No.

59 at 16.[65]  Similarly to the puncture wound, however, the record shows nothing more than a

---

[64] Fitzgerald avers that he asked his doctor to authorize him to return to work in full despite his
limitations.  See Fitzgerald Decl. at ¶ 6.  The fact remains that his doctor issued him an
unrestricted return-to-work note and there is no evidence that a doctor would have done so
simply because a patient asked if the patient in fact had significant limitations.

[65] Fitzgerald's opposition is unclear as to whether he was asserting that the anal fissure
constituted an actual disability or a "record of disability."  In any event, these two definitions of
disability "represent two sides of the same coin."  Mancini, 909 F.3d at 40.  "Both definitions
hinge on whether the plaintiff has shown a physical or mental impairment that affects a major
life activity, and if so, whether the impairment substantially limits the major life activity."  Id.
(citations omitted).  The difference is that an actual disability requires a showing that the plaintiff

temporary condition without long-term or permanent effects.  See SOF ¶¶ 10-16; Resp. ¶¶ 10-16.

Fitzgerald submitted a doctor's note dated May 17, 2019, clearing him to work without any

restrictions on May 27, 2019.  SOF ¶ 16.  Even if the anal fissure could be considered an actual

disability, however, there is no evidence that the Defendants were ever aware of it or of

Fitzgerald's alleged limitations as a result.  By Fitzgerald's own account, he may have told

Captain Martin that he only had a "stomach problem" or "gastrointestinal issues."  Resp. ¶ 11.

The doctor's note authorizing his return to work contains no diagnosis or treatment.  Docket No.

50-10.  Fitzgerald therefore cannot maintain a disability discrimination claim based on this

condition.  See Boadi v. Center for Human Dev., 239 F.Supp.3d 333, 350-351 (D. Mass. 2017)

(citations omitted) ("[A] plaintiff cannot sustain a prima facie case of disability discrimination

without showing that an employer had constructive knowledge of the plaintiff's disability.").

Accordingly, I find that Fitzgerald had failed to raise a triable issue that he had an actual

disability.

2.   There Is No Evidence From Which A Jury Could
     Find That The Defendants Regarded Fitzgerald As Disabled

Fitzgerald also argues that the Defendants regarded him as disabled.  Docket No. 59 at

14-17.  "'[R]egarded as' claims require only a showing that the plaintiff 'has been subjected to an

action prohibited under [the ADA] because of an actual or perceived physical or mental

impairment."  Mancini, 909 F.3d at 45 (citing 42 U.S.C. § 12103(3)(A)).  "It is not necessary for

the plaintiff to prove that the impairment limits or is perceived to limit a major life activity."  Id.

(citations omitted).  The actual or perceived impairment, however, cannot be "transitory and

minor."  Id. at 46 n.7 (citing 42 U.S.C. § 12103(3)(B)).  The employer bears the burden of

---

has a cognizable disability while a "record of disability" may be satisfied by a showing that the
plaintiff had a disability in the past.  Id.

establishing the "transitory and minor" exception as an affirmative defense.  Id.

"A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B).  Although the ADA does not define the term minor, the Third Circuit has suggested "such factors as the symptoms and severity of the impairment, the type of treatment required, the risk involved, and whether any kind of surgical intervention is anticipated or necessary—as well as the nature and scope of any post-operative care." Eshleman v. Patrick Indus., Inc., 961 F.3d 242, 249 (3d Cir. 2020).  An impairment is not transitory and minor if the employer "mistakenly believ[es]" it to be more serious or longer in duration.  See 29 C.F.R. Part 1630 App. Section 1630.2(l) ("[A]n employer that terminated an employee with an objectively 'transitory and minor' hand wound, mistakenly believing it to be symptomatic of HIV infection, will nevertheless have 'regarded' the employee as an individual with a disability, since the covered entity took a prohibited employment action based on a perceived impairment (HIV infection) that is not 'transitory and minor.'").

With respect to the anal fissure, Fitzgerald admitted that he never informed the Defendants about that condition or its causal relationships to his absences.  See SOF ¶¶ 11-16; Resp. ¶¶ 11-16.  There is no evidence that Defendants were aware of the limitations Fitzgerald alleges as a result of the anal fissure.  It is also undisputed that he returned to work and/or was cleared to return to work without restrictions shortly after each of the absences he attributes to the anal fissure.  See SOF ¶¶ 12, 14, 16; Resp. ¶¶ 12, 14, 16.  Under such circumstances, no reasonable jury could find that the Defendants regarded him as disabled due to his anal fissure.

With respect to the puncture wound, the Defendants argue that it was objectively transitory and minor and, therefore, does not constitute a "regarded as" disability.  Docket No. 49 at 15-17.  Fitzgerald acknowledges that this condition was transitory but argues that the

Defendants have not established that it was minor. Docket No. 59 at 15-16. Fitzgerald's injuries did not necessitate surgery and the alleged limitations caused by them lasted, at most, three months. Further, he was cleared to work without restrictions fifteen days after the injury. Therefore, I find that this condition was objectively minor.

An employer who takes a prohibited employment action against an employee with an objectively transitory and minor impairment, mistakenly believing it to be symptomatic of a potentially disabling impairment, has nevertheless regarded the employee as disabled. See 29 C.F.R. Part 1630 App. Section 1630.2(l). Fitzgerald argues that even if his condition was objectively minor, the Defendants perceived his condition as being ongoing and more than minor and therefore regarded him as disabled. Docket No. 59 at 16. Fitzgerald cites to Chief Moriarty's allegedly mistaken belief that Fitzgerald had suffered a broken bone and his statements concerning Fitzgerald's use of sick leave. See id. Even if Chief Moriarty mistakenly believed that Fitzgerald's arm was broken, that belief does not result in the Defendants regarding Fitzgerald as disabled because a broken bone is generally a transitory and minor impairment. See, e.g., Clark v. Boyd Tunica, Inc., No. 3:14-cv-00204, 2016 WL 853529, at *6 (N.D. Miss. Mar. 1, 2016) (citations omitted). With respect to Chief Moriarty's statements regarding Fitzgerald's use of sick leave, there is no evidence linking such statements to any perceived disability. Accordingly, I find that there is no evidence from which a reasonable jury could find that the Defendants regarded Fitzgerald as disabled within the meaning of the ADA or Chapter 151B.

      D.     There Are Issues Of Fact With Respect To Whether Fitzgerald
             Was A Qualified Individual At The Time Of His Termination

In order to prevail on his claims, in addition to showing that he has a disability, Fitzgerald must show that he was able to perform the essential functions of his job, either with or without

reasonable accommodation.  <u>Tobin</u>, 433 F.3d at 104.  The Defendants argue that even if Fitzgerald was disabled within the meaning of the ADA or Chapter 151B, his claims would still fail because he could not perform the essential functions of his job, with or without reasonable accommodation due to his failure to complete the Academy within one year.  Docket No. 49 at 17-19.

Fitzgerald alleges that there was no one-year requirement to complete the Academy and argues that he remained qualified because he could have completed the Academy in a succeeding class.  Docket No. 59 at 17.  Contrary to the Defendants' arguments, nothing in the record conclusively establishes a one-year requirement for completion of the Academy.  While the employment offer letter and the collective bargaining agreement provided that completion of the Academy was a job requirement, neither mention a one-year requirement.  Docket No. 50-2; Docket No. 50-3 at 55.  The Defendants' answers to interrogatories do not, on their own, conclusively establish such a requirement in the face of contradictory evidence.  Docket No. 50-4 at 3.

Fitzgerald has pointed to evidence disputing the assertion that completion of the Academy must occur within the one-year probationary period.  Chief Moriarty testified that the Department does "everything [it] can" to ensure that trainees complete the Academy within the one-year probationary period and "have been successful so far" in doing so, but he also testified that he does not usually give trainees a hard deadline by which they must complete the Academy.  <u>See</u> Docket No. 58-15 at 59-61.  In addition, Fitzgerald has pointed to evidence that suggests that he could have re-enrolled in and completed another Academy class, including a class that would have graduated within the one-year probationary period.  <u>See</u> Docket No. 50-20; Docket No. 58-8.  Accordingly, issues of fact exist as to whether Fitzgerald could have performed the essential

functions of his job, with or without reasonable accommodation.[66]

E.   Fitzgerald Has Failed To Create A Triable Issue Regarding Pretext

Fitzgerald maintains that he has direct evidence of disability discrimination by the Defendants in the form of Chief Moriarty's reliance on Fitzgerald's use of leave in recommending termination and his statement that Fitzgerald "washed out of the academy" due to his medical issues.  See Docket No. 59 at 19-20.  He argues, therefore, that "a mixed-motive analysis applies" and he "need prove only that the discriminatory action was *a motivating factor* in an adverse employment decision."  Id. at 19 (emphasis in original; citing Patten v. Wal-Mart Stores East, Inc., 300 F.3d 21, 25 (1st Cir. 2002)).

Direct evidence is that which "unambiguously implicates a disability discrimination motive" and "consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision."  Patten, 300 F.3d at 25 (citations omitted).  For a statement to constitute direct evidence, the First Circuit requires that the statement give a "'high degree of assurance' that a termination was attributable to discrimination."  Id. (citation omitted).  "A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence."  Id. (citation omitted).  Direct evidence is therefore "relatively rare."  Id.

---

[66] The Defendants argue that Fitzgerald's assertions that he remained qualified because he could have re-enrolled in the Academy fail because there is no evidence in the record that he ever requested such an accommodation.  Docket No. 64 at 11.  The Defendants' argument, however, conflates the qualification and reasonable accommodation analyses.  See E.E.O.C. v. Amego, Inc., 110 F.3d 135, 141 (1st Cir. 1997) (cautioning that "[a]lthough the qualification analysis could be understood to subsume the concept of reasonable accommodation, we think it analytically sounder to treat the two topics separately").  Here, Fitzgerald has not brought a claim for failure to accommodate.  Rather, he alleges that he was terminated because he was disabled.

Chief Moriarty's statements in his letter recommending termination do not meet this standard.  They are subject to a benign interpretation that Fitzgerald's repeated absences resulted in his failure to complete the Academy.  Chief Moriarty's reference to Fitzgerald "medical" issues are insufficient to constitute direct evidence of discrimination.  See Patten, 300 F.3d at 25-26 ("A decisionmaker's mentioning of a disability in the context of an adverse employment action cannot, without more, constitute direct evidence of discrimination.").

Because Fitzgerald has not provided direct evidence of discrimination, his case proceeds under the McDonnell Douglas burden shifting framework.  See Ramos-Echevarria v. Pichis, Inc., 659 F.3d 182, 186 (1st Cir. 2011).  Under that framework, once the plaintiff establishes a prima facie case of discrimination,[67] the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action.[68]  See id.  If the employer offers a non-discriminatory reason, the burden then shifts back to the plaintiff to show that the employer's justification is "mere pretext cloaking discriminatory animus."  Id. (citation omitted).

Here, the Defendants have met their burden of articulating lawful reasons for terminating Fitzgerald.  Specifically, they have provided evidence that Fitzgerald was terminated due to his performance deficiencies and his failure to complete the Academy.  See Docket No. 49 at 20.  In order to avoid entry of summary judgment against him, therefore, Fitzgerald "must offer

---

[67] As discussed above, Fitzgerald has failed to establish a prima facie case of discrimination because he has not shown that he was disabled.  Nevertheless, this Court addresses the pretext analysis.

[68] This burden is one of production, not of persuasion.  Ramos-Santiago v. WHM Carib, LLC, 919 F.3d 66, 73, n. 6 (1st Cir. 2019) (citing Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133, 142 (2000)).  Thus, the burden of persuasion never shifts to the defendant-employer under the McDonnell Douglas framework.  Id.

evidence that would allow a reasonable jury to find 'that the employer's proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory.'" <u>Rios v. Centerra Group LLC</u>, 106 F.4th 101, 112 (1st Cir. 2024) (citation omitted).

"In assessing pretext, our focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." <u>Id.</u> at 113 (citation omitted).  "It is 'not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." <u>Id.</u>[69]

In arguing that the Defendants' proffered reasons for his termination were pretextual, Fitzgerald alleges that he could have re-enrolled in the Academy.  Docket No. 59 at 21.  There is no evidence, however, that he requested to be re-enrolled or that the Defendants were required to offer, or would normally offer, re-enrollment under the circumstances.

Fitzgerald also alleges that the Defendants had never fired someone for a deficient performance or failing examinations after being able to complete attendance in the program.  <u>Id.</u> Fitzgerald, however, has not pointed to any evidence of other recruits that were treated more favorably than him.  The only evidence in the record pertains to one other recruit who was in fact terminated for failure to complete the Academy within the statutory probationary period.  SOF ¶ 45; Resp. ¶ 45.  Finally, to the extent that Fitzgerald points to "shifting rationales" for his

---

[69] Though the analysis under the ADA and Chapter 151B is substantially similar, <u>see</u> <u>Brader v. Biogen, Inc.</u>, 983 F.3d 39, 54 (1st Cir. 2020), this is one area where the two differ. Massachusetts is a "pretext only" jurisdiction, meaning that, to survive summary judgment, the plaintiff "need only present evidence from which a reasonable jury could infer that '[employer's] facially proper reasons given for its action against him were not the real reasons for that action.'" <u>Id.</u> at 59 (citations omitted).

termination, those rationales (i.e., attendance issues) are not inconsistent with his termination for failure to complete the Academy.  The fact remains that Fitzgerald was absent on a mandatory attendance day due to an exam being administered.  See Docket No. 50-20.  Accordingly, Fitzgerald has failed to create a triable issue regarding pretext.

As Fitzgerald has failed to raise a triable issue whether he was disabled and whether the Defendants' proffered reasons for his termination were pretextual, he cannot prevail on his claims and the Defendants are entitled to summary judgment in their favor.[70]

III.  ORDER

For the foregoing reasons, I grant the Defendants' motion for summary judgment.

   /s/ Jennifer C. Boal
JENNIFER C. BOAL
U.S. MAGISTRATE JUDGE

---

[70] To the extent that the Defendants have made other arguments in support of their motion, this Court finds it unnecessary to address them.